MARION F. EDWARDS, JUDGE PRO TEMPORE, JUDGE
Defendant, Brian Banks, appeals his conviction and sentence on a charge of aggravated rape of a child under the age of thirteen in violation La. R.S. 14:42.[1] We affirm the conviction and sentence and remand with instructions.
Banks was charged by grand jury indictment with the crime of aggravated rape of *1242 a child under the age of thirteen on November 12, 2015. He pled not guilty and in due course was tried by a jury. On September 1, 2016, the trial ended in a deadlocked jury and a mistrial. The matter was set for re-trial on September 26, 2016. Banks filed a motion to recuse the presiding judge who declared a mistrial in the first trial, alleging that the judge would be unable to conduct a fair and impartial trial in second prosecution based on comments he made in a bond reduction hearing. That motion was granted and the matter went to a second jury trial before a different judge on February 6, 2017, after which the jury found Banks guilty as charged. Banks filed motions for new trial and for post-verdict acquittal. The trial court denied both motions and sentenced Banks to serve life in prison without benefit of parole, probation or suspension of sentence. This timely appeal followed.
FACTS
The victim, L.H., is the biological daughter of defendant Brian Banks and C.H. The couple has one other younger child, J.H. Banks and C.H. divorced in 2011, and defendant moved into an apartment near Oakwood Mall in Gretna. Banks had visitation rights with his children and took them for weekend visits until he moved to Texas in 2012.
At trial, L.H. testified that on one of those weekend visits in February of 2012, Banks raped her. L.H. explained that February 20, 2012 was her tenth birthday, and that morning her father took her and her little brother, J.H., to play golf. When they arrived back home, J.H. went into the living room to watch television. Banks told L.H. to go into his bedroom. Because he sounded angry, she obeyed. About twenty minutes later Banks came into the room and told L.H. to take off her pants and underwear. When she refused, her father started to undress her. She kicked and told him "no" but he continued. He picked her up by the waist and turned her over and raped her. L.H. described the rape and stated that at some point she stopped fighting and telling her father to stop because she didn't want her brother to see what was happening. When it was over, Banks told L.H. she would go to hell if she told anyone. L.H. told her father she was not going to hell and he "smacked" her. Then Banks left the room and L.H. put her pants and underwear back on.
L.H. testified that she didn't tell anyone what happened because she was embarrassed. She was in pain for a while, but felt physically better the next day. The night of the incident she thought about when she should tell someone and decided that it would be after three years. Her reasoning was that she was ten-years-old the day it happened and seven was her favorite number, so she subtracted seven from ten and got three. She testified that during those three years she didn't get much sleep and had recurring nightmares about her father. Shortly after the incident, defendant moved to Texas and L.H. has had little contact with him since then. L.H. explained that she didn't know what rape was at the time it happened, but learned later about sex in sex education at school.
L.H. related that her father also physically abused her when she was nine or ten. She stated that he would hit her in the mouth with the back of his hand. She also said that one time Banks cut her on the back of her arm when she did "something wrong" to the red beans she was cooking for him.[2]
*1243 C.H., L.H.'s mother, testified that after her tenth birthday, L.H. became moody and had a bit of an attitude, but C.H. attributed that behavior to the divorce. In January of 2015, L.H. attended Lakewood Elementary School in Luling and was suspended for passing a razor blade in class. Since L.H. had never been in trouble before, C.H. was concerned and wanted to put an end to any bad behavior.
After L.H. was suspended, C.H. approached Donna Bowie, a fellow church member who worked with troubled youths, and asked her to speak with L.H. Ms. Bowie agreed and took L.H. to Taco Bell after their church service. According to Ms. Bowie, L.H. began to cry and became visibly upset during their conversation. Ms. Bowie asked L.H. what was wrong, and L.H. responded that her dad had raped her the weekend of her tenth birthday when she and J.H. were visiting him at his apartment, and she had never told anyone. L.H. said defendant told her to go into the bedroom and not to ask questions.
In her testimony, L.H. verified that Ms. Bowie was the first person she told about the incident. L.H. explained that she was in trouble in school for passing a razor blade to a friend and was suspended for nine days. Her mother was worried about her and wanted her to talk to someone because "a whole bunch of stuff was different." When Ms. Bowie told C.H. what L.H. had disclosed to her, C.H. consulted an attorney and, taking her advice, filed proceedings to terminate defendant's parental rights.[3] At this point authorities were not notified about the incident.
In April of 2015, L.H. was adopted by C.H.'s current husband. On the day the adoption was final, L.H., who was a student at LaPlace Elementary School in St. John the Baptist Parish, was found exchanging notes with another student in which they shared experiences of rape. The teacher who discovered the notes took them to the school counselor, Mechelle Terrio, who spoke to each of the girls individually. When confronted, L.H. began to cry. She told Ms. Terrio that she was raped by her father on the weekend of her tenth birthday and that her mother knew about it. Ms. Terrio called L.H.'s mother, who confirmed that she knew about the rape and stated that her lawyer was "handling this." Ms. Terrio advised the mother to make a police report. Ms. Terrio, who is statutorily bound to report sexual abuse, called Detective Anne Taylor, a detective with the St. John the Baptist Parish Sheriff's Office.
Detective Taylor met with Ms. Terrio and viewed the note. She also went to interview L.H. and her mother. Detective Taylor testified that L.H. was nervous and frightened. L.H. told the detective she and her little brother spent the weekend of her tenth birthday with their father. During that weekend, her father raped her in the bedroom of his apartment. Although L.H. could not tell the detective where the apartment was located, she recalled that it was behind a mall. When Detective Taylor realized L.H was talking about Oakwood Mall in Gretna, the detective immediately ended the interview out of concern for L.H. Detective Taylor explained that Oakwood Mall is in Jefferson Parish and therefore out of her jurisdiction. She also explained that in her experience children become more traumatized with every discussion of the event.
Detective Taylor reported the incident to the Jefferson Parish Sheriff's Office and advised C.H. to report it also. The matter *1244 was assigned to Detective Christopher Vado, of the personal violence unit in the Jefferson Parish Sheriff's Office. Detective Vado spoke with Detective Taylor who told him about the note and the allegations. Detective Vado contacted the child's mother and arranged a meeting for June 9, 2015. The detective first interviewed the child alone. Detective Vado said that L.H. was sad and cried when she told him the details of the rape. Then Detective Vado spoke to C.H. without disclosing the details L.H. provided. C.H. told the detective that she was concerned because L.H. was acting out in school so she asked Donna Bowie, a friend from her church who worked with troubled youths, to talk to her daughter. L.H. told Ms. Bowie about the rape. Ms. Bowie told C.H and advised her to contact police. Detective Vado verified this with Donna Bowie to corroborate the information received from C.H. He also got the address of Banks' apartment at the time of the incident from C.H. and verified with the manager of the apartment complex that Banks was living there at that time.
Detective Vado scheduled an appointment for a forensic interview with Jefferson Children's Advocacy Center (JCAC), a neutral setting. He monitored the interview to ensure the interviewer did not ask leading questions or feed information to the child. Detective Vado testified that proper procedures were followed and that all information and descriptions of the rape came from the victim.
Brittney Bergeron, a forensic interviewer at the JCAC, testified that she is trained in conducting fact-finding interviews with any child who has made allegations of physical or sexual abuse or witnessed a violent crime. She described the advocacy center as a child-friendly, safe, neutral environment where children can talk about any allegation of abuse. Usually, these interviews are set up by a law enforcement officer who monitors the interview. In the interview, Ms. Bergeron speaks to the child alone without parents. The interview is recorded and the child is aware of the recording. Ms. Bergeron asks questions in a non-leading, non-suggestive way.
In the interview, L.H. said that on her tenth birthday, she, Banks and J.H. went golfing, and when they returned to Banks' apartment he told L.H. to go into his room. L.H. told Ms. Bergeron that her father seemed mad, and she didn't know why. About twenty minutes later, she recalled that he came into the room while she was sitting on the bed and told her to take her pants and underwear off, and he "smacked" her with his hand when she said no. She recalled that J.H. was in the other room watching TV. She stated that her father, a big guy, began to unbuckle her pants and pulled off her pants and underwear at the same time as she was sitting on the bed kicking him. Defendant threw her pants and underwear on the floor and then turned her over, grabbed her by the waist and started raping her. She stated that he took his private area, his male part, and put it in her private area, her female part. In describing the location of the private areas, she gestured towards the middle of her body and genital area. She recalled that she was on her hands and knees at the time and only wearing a white and pink polka dot sparkle shirt. During the rape her father had the back of her shirt wrapped around his hand. L.H. said she tried to fight him, and it hurt really bad inside. She stated that he kept shoving his private area in and out of her private area, and it felt like three or four hours until defendant stopped, but it probably wasn't that long.
L.H. stated that when he stopped, Banks told her that if she told anybody she would go to hell, and he "smacked" her *1245 with the back of his hand when she told him no. Then Banks left the room. When L.H. put her pants and underwear on she noticed that the carpet next to the bed felt wet but she did not know why. She left the room, and her father asked her if she wanted something to eat, to which she said no. About thirty minutes later, L.H. tried to urinate, but she said that it hurt and felt "weird."
L.H. said that later that night she wanted to tell someone, but felt like she could not. She decided that since it was her tenth birthday and seven was her favorite number, and seven plus three is ten, she could not tell anyone for three years or until she was thirteen. She stated that when she was almost thirteen years old, she told Ms. Bowie when they were talking in her car after church. She did not want to tell her mother because she was scared, but Ms. Bowie told C.H. L.H. described her father as very abusive and "out of it." L.H. said that she had to do everything for him after the divorce, and if she did not do something right, he would "smack" her. She described the incident when she did something wrong while cooking red beans and Banks cut her on the back of her arm as punishment. She showed Ms. Bergeron the scar on the back of her arm from the cut inflicted by defendant. She said that her father called her on her thirteenth birthday, but she told C.H. to tell him she did not want him to be part of her life anymore because she and her brother now had a dad that cared about them.
The prosecution also offered testimony from Anne Troy, a nurse practitioner who specializes in child maltreatment forensics. Ms. Troy is employed by the Audrey Hepburn Care Center, part of Children's Hospital, and was qualified as an expert in the field of forensic pediatrics and child abuse. Since 2010 Ms. Troy has evaluated thousands of victims of sexual abuse. She explained her process to the jury. She starts the interview with the child with as little information as possible so as to avoid prejudice. Ms. Troy only reads enough of the report to determine the nature of the abuse and the identity of the alleged perpetrator in order to keep the child on topic. She then gets a medical and educational history from the parents without going into any discussion of the alleged abuse. Next, she conducts an interview to discover if the child's statements are consistent with sexual abuse. Ms. Troy explained that, because her interview is medically driven, she asks different questions than the forensic interviewer.
Ms. Troy met with L.H. in July of 2015. She did an incident history and physical evaluation. In that interview L.H. describes how her father took her into the bedroom, pulled her up by the waist and removed her pants and underwear. L.H. tried to fight her father off, to no avail. She gave a clear and detailed history of the sexual abuse in which she described penile-vaginal penetration. L.H. stated that it hurt and that the carpet was wet where she sat down after the rape to put her underwear back on. She also told Ms. Troy her father told her she would "go to hell" if she told anyone about the rape.
L.H. also said that her father physically abused her on other occasions. She describes incidents in which she was "smacked with a spoon" and cut with a knife. L.H. talked about one time when she was nine-years-old and trying to cook red beans for her father. She put too much salt in the beans and her father punished her by cutting her arm with a knife. These statements are supported by Ms. Troy's observation of a scar on L.H.'s arm noted in the medical report. L.H. also told Ms. Troy her father physically abused her little brother. L.H. also revealed that she has struggled with depression and suicidal thoughts since the rape.
*1246 L.H. stated she didn't want to tell her mother about the abuse because she was embarrassed. She still has not discussed the details with her mother because she knows her mother feels bad about not protecting her and "doesn't want to deal with it." On cross-examination, L.H. acknowledged that her father moved to Texas shortly after the incident. She denied that the move made her angry, but acknowledged that it made her sad. She testified that she still loves her father and forgives him, but she feels he should be held accountable for his actions. In her testimony, L.H. repeatedly stated that she was telling the truth about the rape.
Ms. Troy stated that it is common for children to delay disclosing abuse. She explained that the very young may think this is normal and not realize they have been abused until they learn about private parts and boundaries. They can also feel shame and confusion, or they may think no one will believe them. Another factor for delayed disclosure can be the circumstances of their environment. A child may feel protective of a parent. L.H. said she couldn't tell her Mom because she didn't think her Mom could "handle it."
Ms. Troy also testified that it is not unusual for a child who has been abused to act out in school. Some children, especially the very young, can suppress the abuse, and be a model student with no behavioral problems. Then as they get older and begin to sexually mature and understand more about sexuality, they realize the sexual abuse they have been suppressing and denying is something that should be disclosed.
Ms. Troy's ultimate conclusion is that L.H.'s account of the sexual abuse, and her reaction to it, are consistent with sexual abuse. Although L.H. had no physical signs of trauma, Ms. Troy concluded that L.H. was raped based on her clear, detailed, and spontaneous description of the events in the context in which they occurred. Further, Ms. Troy opined L.H.'s description of the events is consistent with how a thirteen-year-old who delayed disclosure would report them. At trial, Ms. Troy testified that many children will wait until they are older to show symptoms, and L.H.'s three-year delayed disclosure and subsequent behavioral issues were normal symptoms which L.H. began to exhibit as she matured. Ms. Troy indicated that this delayed disclosure also results in a lack of physical symptoms of sexual abuse upon a victim. Ms. Troy testified that L.H.'s symptom of self-blaming was a normal emotional response. She further testified that L.H.'s continued struggle with depression and suicidal thoughts to cope with the rape were consistent with a history of sexual abuse.
The defense offered the testimony of Elwin Epps, a friend of Brian Banks. Mr. Epps testified that in February of 2012 he played golf with Banks regularly. He said that on February 20, 2012, he went to Banks' apartment to pick him up for a game of golf. It was President's Day, so it was a holiday for Mr. Epps who is a federal employee. When he got to Banks' home, his children were there and Banks was waiting for his ex-wife to pick them up. L.H. told Mr. Epps it was her tenth birthday. Banks asked Mr. Epps to stay between him and his ex-wife's boyfriend to "make sure nothing don't happen." When the children left, Mr. Epps and Banks went to play golf at about 1:00 or 1:30 in the afternoon. Mr. Epps brought Banks home when the game was over and it was "darkish."
Mr. Epps acknowledged that he originally told investigators that he did not play golf with Banks that day, but stated that he now remembered that he did. He explained that he checked an old phone for text messages when he realized February *1247 20, 2012 was a federal holiday. That helped to jog his memory. One text message from defendant to Mr. Epps on February 19 provides, "OK. What [time] you coming through?" A message on February 20, 2012, at 10:57 a.m., which Mr. Epps sent to defendant reads, "I'm here." Mr. Epps claimed that he was in front of defendant's apartment at the time the message was sent. The next day, February 21, there were text messages between the two men about a long putt Mr. Epps had made.
Brian Banks testified at trial in his own defense. He stated that he moved to Texas to pursue job opportunities in 2012 and since that time he has remarried. He was close to L.H. and her brother before the move, but since then has been unable to return to Louisiana due to a lack of adequate transportation. He did try to call L.H. on her birthday in 2015, but she wouldn't speak to him.
Banks testified that L.H. and her brother spent the weekend of February 20, 2012 with him in his apartment in Terrytown. Because he did not have transportation, they walked across the street to Oakwood Mall to shop for L.H.'s birthday. He acknowledged that he testified in the original trial that he did not remember L.H.'s tenth birthday. He stated that he did not remember playing golf with Mr. Epps on February 20, 2012 until he saw the text message during Mr. Epps testimony in the current trial. His prior testimony was that he did not remember playing golf that day, but if he did he probably took the children.
Banks testified that he is not lying, rather it is his daughter who is lying and has lied to everyone. He believes the reason she lied is because she is disappointed in him for leaving and misses him. He maintains he never raped his daughter.
On rebuttal, the State called Eugenio Santos, an investigator for the Jefferson Parish District Attorney's Office, who testified that he was present at an interview between an attorney and Elwin Epps on September 1, 2016 in the attorney-client room at the courthouse. At that time, Mr. Epps said he was with Banks and his children from 11:00 am to 1:00 pm on February 20, 2012, but stated that they did not play golf. He did recall that L.H. told him it was her tenth birthday. There was no mention of text messages at that time.
LAW AND ANAYLSIS
There are two briefs for our consideration in this appeal, one from defense counsel and one from defendant. The single assignment of error is the same in both briefs. Both defense counsel and defendant assert the evidence is insufficient to sustain the verdict.
In his counseled assignment of error, defendant argues that under the standard enunciated in Jackson v. Virginia[4] , the evidence presented during trial was not sufficient to convict him of aggravated rape beyond a reasonable doubt. In support of that assertion, defense counsel contends that there was no physical evidence to support L.H.'s allegation, and her JCAC interview and trial testimony were inconsistent with her initial statement made to Detective Vado. It is further argued that L.H. made not only inconsistent, but also incredible statements, including her explanation that she failed to disclose the incident for three years because seven was her favorite number, and ten minus seven was three. Last, defense counsel avers that the victim's statements were impeached by other witnesses and physical evidence in the form of text messages, which negates her statement that she played golf with defendant and J.H. on the date of the incident.
*1248 In his pro se assignment of error, Banks similarly asserts that the State failed to meet its burden of proof for every essential element of the crime charged beyond a reasonable doubt. He contends that he submitted direct evidence of his "solid alibi" that proved he was playing golf on the afternoon of the alleged rape while L.H. was with C.H. He suggests that L.H.'s allegation derived from her being upset about his move to Houston, Texas, and his remarriage to another woman. He also asserts L.H.'s testimony was self-contradicting, unsupported, and uncorroborated by any physical evidence.
Defendant avers that a "pivotal change in the dynamics of the case" occurred when Mr. Epps came forward with text messages which were entered into evidence on the last day of trial. He argues that the jury was not admonished after this "shift in dynamics" or informed of their obligations and responsibilities in accord with the law, and as a result, the jury did not properly weigh the evidence presented which clearly exonerated him. He also argues that the jury was out of patience after the two-day trial and rushed to judgment.
The State responds that it presented evidence sufficient for defendant's conviction of aggravated rape. It contends that pursuant to Jackson , supra , and Louisiana jurisprudence, L.H.'s testimony alone is sufficient to sustain defendant's conviction. It further asserts that it presented prior consistent statements and several witnesses to corroborate L.H.'s testimony. The State notes that even if L.H. presented some inconsistent statements upon which she was impeached, this does not mandate a finding of reasonable doubt, especially in light of the traumatic event that L.H. experienced. Finally, it maintains that defendant's alleged "issues" with its case were presented to the jury, and the jury found L.H. credible. The State argues that credibility should not be re-weighed, and the Court should affirm defendant's conviction and sentence.
When the issue of sufficiency of evidence is raised on appeal, the reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson , supra . Under the Jackson standard, a review of the record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt, but rather, the reviewing court is required to consider the whole record and determine whether any rational trier of fact could have found guilt beyond a reasonable doubt.[5]
In cases involving circumstantial evidence, the trial court must instruct the jury that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."[6] The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.[7]
Defendant was convicted of aggravated rape upon a known victim under the age of *1249 thirteen, a violation of La. R.S. 14:42. Aggravated rape is defined, in pertinent part, as "a rape committed ... where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed ... [w]hen the victim is under the age of thirteen years."[8] When the rape involves vaginal or anal intercourse, any sexual penetration, however slight, is sufficient to complete the crime.[9]
We find the State presented sufficient evidence to prove that Banks, L.H.'s biological father, raped L.H. by forcing her to engage in vaginal intercourse with him on her tenth birthday. L.H. explained that the incident occurred at Banks' apartment near Oakwood Mall, and the testimony revealed that Banks resided at the Alexas Gardens Apartments near Oakwood Mall at the time of L.H.'s tenth birthday.
Although the record contains some minor inconsistencies in the testimony, including at what point L.H. disclosed the incident to Ms. Bowie, we find upon review that L.H. consistently reported the details of the events surrounding defendant's sexual abuse to numerous people, including Ms. Bowie, Brittany Bergeron, Anne Troy, and Detective Vado.
As to her position at the time of the rape, L.H. was consistent in her testimony at trial, her statements in the JCAC interview, and in the Care Center interview, that she was on her hands and knees and defendant had his hand wrapped around the back of her shirt. The only inconsistency here is the testimony of Detective Vado, who testified that L.H. informed him that she was on her back. However, the detective admitted he could have drawn an incorrect conclusion when speaking with L.H.
This Court has held that even when some slight inconsistencies in a victim's testimony, interviews, and statements are present, a jury's decision to believe the victim over the defendant is rational when the victim consistently described the details of the incident throughout her statements, interviews, and testimony.[10] Additionally, the testimony of the victim alone can be sufficient to establish the elements of rape even without physical evidence.[11] Further, this Court has recognized that expert testimony can assist a jury in understanding the significance of a child-witness's demeanor, inconsistent reports, delayed disclosure, and recantation.[12]
At trial, Ms. Troy testified that many children will wait until they are older to show symptoms, and L.H.'s three-year delayed disclosure and subsequent behavioral issues were normal symptoms which L.H. began to exhibit as she matured. An expert witness can explain to the jury that a child-witness's seemingly abnormal behavior (such as delayed reporting, inconsistent statements, and recantation) is normal for children who have been sexually abused and can also dispel jurors' inaccurate perceptions allowing them to better assess a child-witness's testimony.[13]
Defendant also seems to contend that there was no physical evidence presented to the jury. We note that the rape occurred three years before the medical examination. As explained in Ms. Troy's *1250 testimony, it is unlikely that any physical evidence of the rape would remain. Furthermore, a conviction for aggravated rape may be upheld in the absence of medical evidence.[14] With sexual offenses, the victim's testimony alone can be sufficient to establish the elements of a sexual offense, even if the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense.[15]
The credibility of L.H's allegation against Banks is questioned in both briefs. Banks argues that he repeatedly denied any sexual abuse of L.H. He refers this Court to the testimony of his friend, Elwin Epps, who testified that he was playing golf with defendant on the day of the rape. Text messages between the two were admitted into evidence in support of defendant's alibi. Banks argues that once the text messages were introduced into evidence to support Mr. Epps' testimony the "fact-finder's responsibilities shifted." He contends the jury must now weigh the credibility of the evidence, not the witnesses. In support of this position, defendant cites La. C.E. art. 305 which provides that, "(i)f the trier of fact finds the existence of the predicate fact, and there is no evidence controverting the fact to be inferred, the trier of fact is required to find the existence of the fact to be inferred."
Defendant's reliance on this code article is misplaced. Although the existence of the text messages is not challenged, these terse text messages do not establish defendant's claim that he was playing golf on the day of the incident. The text messages between he and Mr. Epps are not physical evidence which proved he went golfing alone with Mr. Epps that day. In fact, the text messages could also arguably corroborate L.H.'s testimony that she and J.H. went golfing with Banks that day. We find the text messages do not present any internal contradiction or irreconcilable conflict with L.H.'s testimony.
The credibility of a witness, including the victim, is within the discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness.[16] The credibility of witnesses will not be reweighed on appeal.[17] In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier-of-fact, is sufficient support for a requisite factual conclusion.[18] Ultimately, the jury believed L.H. and rejected defendant's version of events. This Court will not re-weigh the credibility of the witnesses. The assignments of defense counsel and defendant relating to the sufficiency of evidence are without merit.
Last, defendant, pro se , argues that several people, including C.H., L.H.'s adoptive father, and Ms. Bowie, failed to report the incident pursuant to La. R.S. 14:403(A)(4)[19] and asserts that his parental rights were removed in an "illegal" adoption proceeding. Defendant avers that if he knew about *1251 this prior to the "illegal" adoption, the petitioners would have faced serious consequences and repercussions for falsification of the adoption paperwork and failure to report the rape of a juvenile. This argument puts Banks in the untenable position of denying that the rape happened, but arguing that individuals L.H. told about the rape falsified a petition for termination of parental rights by not reporting the rape. Nevertheless, this argument does not relate to the issue of sufficiency of evidence and is irrelevant to this appeal. Accordingly, it is without merit.
ERRORS PATENT
Upon review of the record for errors patent[20] , we find that the record does not reflect that defendant was notified of Louisiana's sex offender registration requirements in accordance with La. R.S. 15:540, et seq. The offense for which defendant was convicted is designated as a "sex offense" under La. R.S. 15:541(24)(a). La. R.S. 15:543A requires the trial judge to provide written notification to a defendant of the sex offender registration and notification requirements. The failure to provide this notification, even where a life sentence has been imposed, is an error patent warranting remand for written notification.[21] Therefore, we remand this matter to the trial court for the purpose of providing defendant with the appropriate written notice of his sex offender registration and notification requirements.
We also find there is an inconsistency between the transcript and the minute entry/commitment. Although the minute entry/commitment indicates that defendant was sentenced to life imprisonment at hard labor in the Department of Corrections, in the transcript, the trial judge failed to state that defendant's life sentence was to be served at "hard labor." If a discrepancy exists between the commitment and the transcript, the transcript prevails.[22]
La. C.Cr.P. art. 879 requires a court to impose a determinate sentence. If there were some discretion allowed by the applicable sentencing statute, the failure to indicate whether the sentence was to be served at "hard labor" would be an impermissible indeterminate sentence.[23] However, here the trial court imposed defendant's sentence pursuant to La. R.S. 14:42, which mandates that the sentence be at hard labor. Because the underlying statute, La. R.S. 14:42, requires the sentence to be served at hard labor and allows no discretion to the trial judge, we find this error to be a harmless error which requires no corrective action.[24]
In addition, while the minute entry/commitment indicates that defendant was properly advised that he had two years from the time his conviction and sentence became final to seek post-conviction relief as required by La. C.Cr.P. art. 930.8, the transcript does not. Again, the transcript prevails.[25] By means of this opinion, we correct this error and inform defendant that no application for post-conviction relief, including an application for an out-of-time appeal, shall be considered if it is *1252 filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.[26]
DECREE
For the reasons assigned above, we affirm defendant's conviction and sentence as corrected, and remand the matter for correction of the error patent as noted herein.
AFFIRMED AND REMANDED

La. R.S. 14:42 was subsequently amended in 2015 to rename the offense to first degree rape.

The State filed a motion to introduce evidence of other bad acts relating to the statements made by L.H. indicating defendant hit her and cut her prior to the alleged sexual abuse. That motion was denied in the trial court. This Court granted the State's writ application, finding the trial court abused its discretion in excluding the evidence of other bad acts. State v. Banks , 16-236 (La. App. 5 Cir. 4/22/16) (unpublished writ disposition).

The basis of the termination was failure to pay child support and failure to visit for over six months.

443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

State v. Allen , 15-231 (La.App. 5 Cir. 10/14/15), 177 So.3d 771, 779-780.

La. R.S. 15:438.

State v. Mitchell , 99-3342 (La. 10/17/00), 772 So.2d 78, 83 ; State v. Washington , 03-1135 (La.App. 5 Cir. 1/27/04), 866 So.2d 973, 977.

La. R.S. 14:42 A(4), now first degree rape.

La. R.S. 14:41 B.

State v. Miller , 11-498 (La.App. 5 Cir. 12/13/11), 84 So.3d 611, writ denied , 12-0176 (La. 9/14/12), 97 So.3d 1012.

Id.

State v. Alfaro , 13-39 (La.App. 5 Cir. 10/30/13), 128 So.3d 515, 525, writ denied , 13-2793 (La. 5/16/14), 139 So.3d 1024.

Id.

State v. Roca , 03-1076 (La.App. 5 Cir. 1/13/04), 866 So.2d 867, 875, 876, writ denied , 04-0583 (La. 7/2/04), 877 So.2d 143

State v. Perkins , 11-162 (La.App. 5 Cir. 12/28/11), 83 So.3d 250, 255.

State v. Ledet , 00-1103 (La.App. 5 Cir. 7/30/01), 792 So.2d 160, 171, writ denied , 01-2451 (La. 9/30/02), 825 So.2d 1185.

State v. Rowan , 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.

State v. Robinson , 02-1869 (La. 4/14/04), 874 So.2d 66, 79, cert. denied , 543 U.S. 1023, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004) ; Perkins , supra, 11-162, 83 So.3d at 255.

Louisiana's Child Abuse Reporting Law requires social workers and other designated "mandatory reporters" to report suspected child abuse to specified state authorities, and a mandatory reporter is subject to criminal penalties if he or she fails to make such a report.

This Court conducts a review of the record for errors patent on the face in accordance with La. C.Cr.P. art. 920 ; State v. Oliveaux , 312 So.2d 337 (La. 1975) ; and State v. Weiland , 556 So.2d 175 (La.App. 5 Cir. 1990).

See State v. Williams , 09-48 (La.App. 5 Cir. 10/27/09), 28 So.3d 357, 368-69, writ denied , 09-2565 (La. 5/7/10), 34 So.3d 860.

State v. Lynch , 441 So.2d 732 (La. 1983).

State v. Pettus , 10-777 (La.App. 5 Cir. 5/24/11), 68 So.3d 28, 32, writ denied , 11-1326 (La. 12/2/11), 76 So.3d 1176.

See State v. Tillery , 14-429 (La.App. 5 Cir. 12/16/14), 167 So.3d 15, 29, writ denied , 15-0106 (La. 11/6/15), 180 So.3d 306.

Lynch, supra .

State v. England , 09-687 (La.App. 5 Cir. 3/9/10), 38 So.3d 919, 925.