802 So.2d 801 (2001)
STATE of Louisiana
v.
Chance LYONS.
No. 01-KA-719.
Court of Appeal of Louisiana, Fifth Circuit.
November 14, 2001.
*802 Lane Rutherford Trippe, Louisiana Appellate Project, New Orleans, LA, Counsel for Defendant-Appellant, Chance Lyons.
Paul D. Connick, District Attorney, Parish of Jefferson, State of Louisiana, Terry M. Boudreaux, Thomas J. Butler, Assistant District Attorneys, Gretna, LA, Counsel for the State of Louisiana, Plaintiff-Appellee.
Panel composed of Judges EDWARD A. DUFRESNE, Jr., SUSAN M. CHEHARDY and WALTER J. ROTHSCHILD.
CHEHARDY, Judge.
On June 12, 1998, the Jefferson Parish District Attorney filed a bill of information charging defendant, Chance Lyons, with purse snatching, a violation of LSA-R.S. 14:65.1. Defendant was arraigned on June 22, 1998 and pled not guilty. On November 5, 1998, the case was tried, but it ended in a hung jury. On February 23, 1999, the matter proceeded to trial again. On February 24, 1999, a six-member jury found defendant guilty as charged.
On February 26, 1999, the State filed a multiple offender bill of information alleging that defendant was a second felony offender. On April 9, 1999, defendant filed a motion for new trial, which was denied on April 22, 1999. On May 10, 1999, defendant denied the allegations of the multiple bill.
On May 11, 1999, the trial court sentenced defendant to imprisonment at hard labor for seven years for the underlying purse snatching offense. After defendant was sentenced on the original offense, trial counsel objected to the original sentence and moved for an appeal. That same day, the defendant stipulated to the allegations of the multiple bill and admitted that he was a second felony offender. The trial judge immediately sentenced the defendant to ten years at hard labor without benefit of probation or suspension of sentence.
On April 4, 2001, defendant filed an application for post conviction relief seeking an out-of-time appeal, which the trial judge granted on April 12, 2001.[1] This appeal follows.
*803 On appeal, defendant asserts that the trial court erred in preventing the defense from recross examining one of the State's witnesses. He contends that the trial court erred in allowing the State to elicit irrelevant and prejudicial testimony from another of the State's witnesses. Finally, he contends that the errors in his case cumulatively mandate reversal. We have reviewed his assignments of error and, for the reasons that follow, we affirm his conviction and remand for re-sentencing.

FACTS
The following facts were developed from trial testimony. On May 14, 1998, Betty Klein went to Wal-Mart with her daughter and granddaughter. When they finished shopping, they walked back to her daughter's car. When they reached the car, Klein saw a man to her right coming up behind another car with his hand completely over his face. As Klein started putting the packages in the trunk, the man came up behind her, grabbed the strap of her purse and pulled it. Klein, however, did not let go of her purse. As Klein's daughter screamed and her granddaughter started crying, she struggled with the man until he pulled her to the ground and she let go of her purse.
The man, who Klein described as in his late 20's and wearing a mustard colored T-shirt, a plain T-shirt and dark shorts, ran away through an opening in the fence behind Wal-Mart, known as "the cut," toward the corner of West Monterey and North Monterey Streets. Klein's cell phone, which was hooked to the side of her purse, fell off while the man was running.
At about noon on May 14, 1998, Jeanne Morales, who lived at 2900 North Monterey Street directly across from the empty lot where "the cut" went through, was in the process of leaving her house and getting into her car to go to her son's school. Morales testified that before she put her son into the vehicle, she heard a lady scream. Then she saw a man, holding a ladies' purse, run through the opening in the fence, run past her and into the area in front of her apartment. Morales saw a cell phone fall to the ground as the man was running. She testified that the man got into a dark-colored mini van with a broken headlight and no license plate and drove off down East Monterey Street. There was no one else in the van.
Morales picked up the cell phone, went to Wal-Mart and asked whether it belonged to anyone. A woman claimed ownership of the cell phone, so Morales went over and gave it to her. As Morales was going back to her house, she saw a police officer and told him what she had seen.
On May 14, 1998, Deputy Dana Parker of the Jefferson Parish Sheriff's Office responded to a report of a purse snatching at Wal-Mart on Behrman Highway. Parker spoke with Klein and her daughter who described the perpetrator as a black male, approximately six feet tall, about one-hundred-fifty pounds, very slim build, possibly wearing a light-colored, maybe mustard-colored shirt, and dark, possibly navy, shorts, and that he was young, about eighteen to twenty years old.[2] Parker broad-cast a description of the perpetrator over the radio.
After speaking with the victim, Parker and other officers canvassed the area. Parker testified that about thirty to forty-five minutes after the incident, Helen McQueen, who was a reliable confidential *804 informant and had given information to Parker numerous times in other cases, flagged her down around 909 or 913 West Monterey Street.
Parker knew that McQueen worked in the area picking up trash and cleaning apartments for one of the owners and that she was always outside. When Parker told her that there had been a purse snatching in the parking lot at Wal-Mart and gave McQueen a description of the perpetrator, McQueen said that she had seen a man known to her as "Chance" run through "the cut" with a purse. Parker testified that she was familiar with Chance Lyons, the defendant in this case.
After speaking with McQueen, Parker continued to canvas the area. Because she was aware that the defendant lived at 920 East Monterey Street, she headed in that direction. When Parker turned the corner toward that address, she saw the defendant out of the corner of her eye standing in the driveway area in front of that address. Parker radioed to another officer to stop him. Parker then radioed an officer at the crime scene to bring Klein to possibly identify the suspect. Klein, however, was unable to identify because she never got a good look at the perpetrator's face. At trial, she testified that the person that the police officers presented to her was similar in build and age to the person who assaulted her and the pants he was wearing were similar to the perpetrator's.
Detective Russell Brunet of the Jefferson Parish Sheriff's Office was the detective in charge of investigating the purse snatching. On the day of the purse snatching, Brunet interviewed the defendant, who told him that he didn't know anything about the purse snatching. After more questioning, the defendant asked for an attorney, and Brunet ended the interview. That day, Brunet also conducted a background check on the defendant and compiled a photographic lineup. Brunet stated that Deputy Parker did not give him the names of any other individuals, including Wayne Ricard, before he compiled the photographic lineup.
On May 15, 1998, Detective Brunet met with Jeanne Morales and showed her the photographic lineup. Morales initially said the individual in photograph number four looked familiar. But after closer inspection, she identified the defendant, who was photograph number three, and provided a handwritten statement of her identification. Morales testified that she was certain that the person shown in number three was the same person she saw come through the fence. Brunet testified that Morales was 100 percent positive with her identification. Based on Morales' identification, Brunet went back to his office and compiled an affidavit and warrant for arrest for the defendant. At trial, Morales also identified the defendant as the man who she saw run toward her through the opening in the fence on the day of the incident.
Also, on May 15, 1998, McQueen again flagged Parker down and told Parker that she thought she had seen Chance running through the hole in the fence, but that she wasn't sure and that it might have been Wayne Ricard. Parker knew that Ricard lived across the street from the defendant and that they both had the same build, height and body style. Parker testified that she doubted the new information from McQueen, because McQueen had never "backtracked" like that before and Parker thought McQueen was scared. Parker, however, stated that she gave the new information to Detective Brunet that day.
A few days later, Brunet and another detective arrested the defendant at his residence. Brunet stated that when he brought the defendant back to the Detective Bureau, the defendant admitted that *805 he knew about the purse snatching, but denied involvement. The defendant also knew who did it, but since he wasn't a "rat," he wasn't going to give them more information. Brunet testified that the defendant was uncooperative and wouldn't even sign a form indicating that he understood his rights.
According to Lieutenant Glenn Toca of the Jefferson Parish Sheriff's Office, a few days after the defendant's arrest, his mother contacted the sheriff's office and told them that she had information which indicated her son had not committed the robbery. Defendant's mother stated that defendant wished to be re-interviewed about the robbery. He was re-interviewed and, at trial, the tape of the interview was played for the jury.[3]
After the interview, Toca contacted Wayne Ricard and interviewed him. Toca testified that the sheriff's office was able to eliminate him as a suspect in the purse snatching that day. Toca stated that photograph number four in the photographic lineup was not a photograph of Ricard.
At trial, McQueen testified that, on May 14, 1998, she started cleaning apartments about 8:00 a.m. Prior to that day, she knew the defendant's face but not his name. At approximately 9:00 or 9:30 a.m., she saw the defendant sitting underneath a tree at his apartment. McQueen said that the defendant was wearing blue jean shorts and no shirt on the day of the incident.
McQueen stated that she knew Wayne Ricard from stealing, breaking into people's apartments, and doing drugs and throwing needles on the ground which she had to clean up. She testified that she saw Ricard about noon on May 14, 1998 running through the parking lot on North Monterey Street on the way to his apartment. McQueen wasn't sure if Ricard was carrying anything with him; however, she never saw him with a purse. She stated that he was wearing a brown shirt with dots on it, brown short pants and tennis shoes with no socks when he went into the apartment and when he came back out.
At trial, McQueen stated that Morales told her on the day of the incident that she had seen a black man running and that he had snatched a purse but that Morales didn't know what the man looked like or what he had on. McQueen admitted that she flagged down Deputy Parker that day and told her that she had seen Chance running, but that she had meant to say Wayne. She explained that, on May 14, 1998, before she went to bed, she and her boyfriend, James Williams, had a conversation that made her realize that she told Parker the wrong name. McQueen told Williams that she saw the man go into apartment number 909, and her boyfriend said, "that's Wayne." She spoke to Parker on May 15, 1998 and told her she had given her the wrong name.
On cross-examination, McQueen admitted that she had not previously mentioned anything about apartment numbers and that being the basis for her realizing she named the wrong person. McQueen also testified that she and Ricard had a conversation, *806 in which he threatened her if she testified against him.
Defendant did not call any witnesses.

DISCUSSION
In his first assignment of error, defendant asserts that the trial court erred in preventing the defense from recross examining Deputy Parker. He specifically contends that the State raised a new issue during redirect examination when the prosecutor questioned Deputy Parker about her reasons for doubting new information given to her by McQueen on the day following the purse snatching. The State asserts that recross examination was not warranted because Deputy Parker had testified about her familiarity with McQueen on both direct and cross examination.
LSA-C.E. art. 611(D) provides in pertinent part:
Scope of redirect examination: recross examination. A witness who has been cross-examined is subject to redirect examination as to matters covered on cross-examination and, in the discretion of the court, as to other matters in the case. When the court has allowed a party to bring out new matter on redirect, the other parties shall be provided an opportunity to recross on such matters.
(Emphasis as found in the original.)
In this case, on direct examination, the prosecutor elicited testimony from Deputy Parker that McQueen worked in the area that Parker patrolled, she had spoken with McQueen many times and, in the past, had received trustworthy information that had proven helpful in other cases. On cross-examination, defense counsel inquired about Parker's doubt about the new information McQueen offered to her on May 15, 1998. In response, Parker indicated that she thought McQueen was scared because, in the more than ten cases that McQueen had worked with Parker on, McQueen had never "backtracked."
On redirect examination, when the prosecutor asked Parker why she felt McQueen's new information was not accurate, Parker stated that she knew from her conversations with McQueen of previous confrontations with the defendant's family and other prominent drug dealers who did not like McQueen talking to the police. Although defense counsel did not object to this testimony when it was given, he requested recross examination of her and the State objected.
Generally, the matter of permitting recross examination is in the sound discretion of the trial judge and in the absence of some showing of an abuse of that discretion, and resulting prejudice, his ruling will not be disturbed on appeal. State v. Brooks, 94-1031 (La.App. 5 Cir. 5/30/95), 656 So.2d 772, 775.
In denying defendant's request for recross examination, the trial judge correctly stated, "[I]t's not new information. It was covered in your cross-examination. You just didn't ask the more extensive questions that you'd have now, because you heard the redirect." We agree. The redirect questions did not involve a new matter, but only an extension of previous testimony. This assignment of error is without merit.
In his second assignment of error, he contends that the trial court erred in allowing the State to elicit irrelevant and prejudicial testimony from Jeanne Morales about her reasons for moving away from the neighborhood. The State responds that the defendant's objection to the State's line of questioning was sustained at trial, which leaves no remedy at the appellate level.
At trial, the prosecutor elicited testimony from Jeanne Morales that she left the *807 neighborhood because her husband's car was burglarized, both of their cars were vandalized, her storage shed was burglarized, and, finally, someone broke into their house while they were asleep. She also testified that she had not had problems like this before the purse snatching incident. Defense counsel did not object to the line of questions until after the witness had given her answers. Accordingly, defendant failed to preserve the issue for appeal because he failed to lodge a contemporaneous objection to that portion of Morales' testimony which he now challenges on appeal. See LSA-C.Cr.P. art. 841.
Even if he had preserved this challenge, an improper reference to other crimes is subject to the harmless error analysis. State v. Simmons, 98-841 (La. App. 5 Cir. 6/1/99), 738 So.2d 1131, 1136, writ denied, 99-2419 (La.4/20/00), 760 So.2d 333. An error is harmless when the guilty verdict actually rendered at trial was surely unattributable to the error. Id. Considering the testimony and evidence presented at trial as a whole, any error in admitting Morales' testimony was harmless because the guilty verdict was surely unattributable to her testimony about incidents that occurred after the purse snatching incident. This assignment is also without merit.
Finally, he contends that the errors in his case cumulatively mandate reversal. The Louisiana Supreme Court has been "unwilling to say that the cumulative effect of assignments of error lacking in merit warrants reversal of a conviction or sentence." State v. Day, 00-64 (La.App. 5 Cir. 5/30/00), 762 So.2d 264, 270-271. We also are unwilling to recognize that the cumulative effect of assignments of error that lack merit would warrant the reversal of a conviction or sentence. This assignment of error is without merit.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals errors patent in this case.
When defendant was sentenced on May 11, 1999, the trial court advised him that he had three years to seek post-conviction relief but failed to indicate when that period commenced. Although, the three-year time period was correct at the time defendant was sentenced, LSA-C.Cr.P. art. 930.8 was amended to shorten the prescriptive period to two years, effective August 15, 1999. This amendment has been held to be retroactive. State v. Boles, 99-662 (La.App. 5 Cir. 11/10/99), 750 So.2d 1059, 1062. Therefore, we instruct the district court to send written notice of the two-year prescriptive period to defendant within ten days of the rendering of this Court's opinion and to file written proof into the record that defendant received said notice.
AFFIRMED; REMANDED.
NOTES
[1] Although defense counsel orally moved for appeal immediately after the defendant was sentenced on the underlying offense, the motion was not entered into the minutes. Defendant's motion for appeal was premature when it was filed after conviction and sentence on the offense but before he was adjudicated to be a multiple offender. However, that procedural defect was cured by the subsequent resentencing. State v. Bagemehl, 98-1134 (La. App. 5 Cir.5/19/99), 737 So.2d 228, 231 n. 1.
[2] Morales corroborated the general description of the perpetrator that was given by Klein and her daughter.
[3] Defendant's statement was taped and transcribed and marked for purposes of identification as state's exhibit ten. In that statement, defendant claimed that when the police arrested him on the day of the incident, he had been standing outside his house for 15 minutes and was wearing blue pants, no shirt and black tennis shoes. He stated that he did not snatch a purse or steal anything that day, and that he didn't have a shirt on, because he had just taken a bath. Defendant said he did not see who snatched the purse, but that the "whole neighborhood" knew that Wayne Ricard had snatched the purse. Defendant stated that he saw Ricard run into his house that day, and that Ricard was wearing blue pants and a grey shirt at the time.