STATE OF LOUISIANA

VERSUS

EDGAR M. HIDALGO

NO. 23-KA-375

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 20-5193, DIVISION "E"
HONORABLE FRANK A. BRINDISI, JUDGE PRESIDING

May 08, 2024

**MARC E. JOHNSON**
**JUDGE**

Panel composed of Judges Jude G. Gravois,
Marc E. Johnson, and Timothy S. Marcel

**AFFIRMED;**
**REMANDED WITH INSTRUCTIONS**
 **MEJ**
 **JGG**
 **TSM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
      Honorable Paul D. Connick, Jr.
      Thomas J. Butler
      Andrea F. Long
      Eric Cusimano

COUNSEL FOR DEFENDANT/APPELLANT,
EDGAR M. HIDALGO
      Edgar M. Hidalgo
      Jane L. Beebe

**JOHNSON, J.**

Defendant/Appellant, Edgar M. Hidalgo, appeals his first degree rape of a juvenile under the age of 13 conviction and life sentence rendered in the 24th Judicial Court, Division "E". For the following reasons, we affirm Defendant's conviction and sentence, and we remand the matter with instructions.

## FACTS AND PROCEDURAL HISTORY

On January 14, 2021, a Jefferson Parish Grand Jury returned an indictment, charging Defendant with the "Aggravated Rape (now known as First Degree Rape) upon a known juvenile (05/06/2005) wherein the child was under the age of thirteen," in violation of La. R.S. 14:42(A)(4).[1] Defendant was arraigned on January 15, 2021 and pleaded not guilty. The case proceeded to trial on February 27, 2023.

At trial, Margaret Haydel, a social worker at John Ehret High School, testified that she met A.M.[2] in September 2019 during his freshman year. She explained that the meeting was a routine, basic screening conducted with the students. The screening included a risk assessment, GAD,[3] and a depression and anxiety screening. Ms. Haydel testified that she was a mandatory reporter, which she defined as "anyone that is responsible and liable to report any concerns of abuse or neglect."

Ms. Haydel testified that the questionnaire for the screening was completed by the students. She would then look over the form and go over it with them, while taking her own notes on the form. To the question "Have you ever been physically, sexually or emotionally abused?" A.M. wrote, "Yes." Ms. Haydel

---

[1] The indictment states that Defendant committed the offense "on or between December 1, 2011 and June 1, 2012."

[2] In the interest of protecting minor crime victims and victims of sexual offenses as set forth in La. R.S. 46:1844(W)(3), the judges of this Court have adopted a policy that this Court's published work will use only initials to identify the victim and any defendant or witness whose name can lead to the victim's identity (*i.e.*, parent, sibling, or relative with the same last name as the victim). *State v. E.J.M., III*, 12-774, 12-732 (La. App. 5 Cir. 5/23/13), 119 So.3d 648, 652 n.1. *Compare State v. R.W.B.*, 12-453 (La. 12/4/12), 105 So.3d 54. *See also*, Uniform Rules of Court - Courts of Appeal, Rule 5-2.

[3] "GAD" is an acronym for "Generalized Anxiety Disorder."

testified that she felt that A.M. was coping well and had family support. She did not make a report of physical, sexual, or emotional abuse at that time. She explained that when she asked A.M. about his answer to the question, he explained that he had "dealt with something" when he was very young but had moved on from it and did not want to go into any details. Ms. Haydel asked him if he was around the person or persons who caused him any kind of abuse, and he said, "no." A.M. also reported being safe. He reported having spoken to his sister and friends about the abuse, but he had not told his mother. He expressed that he was trying to move on. Ms. Haydel told A.M. that he could speak to her anytime he wanted to. Ms. Haydel testified that had she had some information regarding a threat to his safety at that time, she would have made a different decision in choosing to pursue the conversation with him. Ms. Haydel testified that, in reference to A.M.'s depression screening in 2019, there was nothing of note in terms of A.M.'s depression at that time. She observed that A.M. was a "normal teenager" at that time.

A.M.'s next assessment was dated September 17, 2020, when he was in the tenth grade. Ms. Haydel testified that follow-up screenings were done with students every year. She explained that, because of COVID-19, students were slowly reintegrated back into the school and were alternating between attending school in person for three days and virtual school for two days. A.M.'s assessment was conducted in person. Ms. Haydel testified that she spoke with A.M. about COVID-19 and coping. A.M. expressed that he had had "[a] rough couple of months." He explained that he was upset because his mom was friends with an ex-boyfriend, Defendant, on social media. A.M. informed her that Defendant was the person whom he referenced the year before, the person who had abused him.[4]

---

[4] Ms. Haydel testified that A.M. referred to the person who abused him as his mom's ex-boyfriend "Edgar," but she was given no other information. She also explained that in her prior assessment, although she was aware of some type of abuse, A.M. never provided her with a name of the perpetrator.

A.M. was upset because his mother thought that the ex-boyfriend was a good person, and she did not know the things he had done to A.M. A.M. had not told his mother about what happened, and that was causing A.M. stress and anxiety. A.M. informed Ms. Haydel that he had cut himself on his bicep. He also stated that he avoided mirrors because he was not comfortable in his own body.

Ms. Haydel testified that there had been a substantial change in A.M. from her last interview with him the prior year. Ms. Haydel noted a score of six out of ten for A.M.'s depression. She testified that A.M. informed her that he had planned to jump off the roof or overdose. Ms. Haydel completed a suicide referral form for A.M. due to his suicidal ideations. In the form, A.M. reported that he had had "[a] rough couple of months" and expressed, "Some days I don't want to be here anymore. I feel disgusted with myself." He also stated that he was not happy in his own body. In her report, Ms. Haydel noted that A.M. stated he drew pictures, and some of those pictures depicted suicidal ideation. Ms. Haydel indicated on her forms that A.M. had depression and PTSD. A.M. stated during their session that over the months of COVID-19, he was reliving and thinking about the trauma he went through, and it was becoming harder to cope with. A.M. told Ms. Haydel that he was sexually abused at age seven or eight by his mother's ex-boyfriend and that he was penetrated by him on several occasions. Ms. Haydel testified that she tried to contact A.M.'s mother, but she did not answer, so a text message was sent to his sister. In her report, Ms. Haydel made a recommendation for A.M. to be taken to the emergency room. She testified that A.M.'s mother met with her and took her son to the hospital. Ms. Haydel met with A.M. again on September 22, 2020 at a follow up meeting. A.M. indicated on the form that he had spoken to his mother and the police to give a report about the abuse. A.M. also indicated that he was in therapy.

Chelsea Moore, clinical social worker at Children's Hospital New Orleans,

testified that she recalled meeting with A.M. She testified as to the following in regards to A.M.'s medical records. A.M. was seen by Dr. Ayush Gupta for a psychiatric evaluation because he had expressed suicidal ideations to his school counselor on the same day. Ms. Moore testified that at the time she met with A.M., the incident of prior sexual abuse had not been reported to the authorities; she contacted his school's counselor to verify whether the abuse had been reported. The school had not reported it, so she called 9-1-1 to make the report.

Before she called the police, Ms. Moore met with A.M., and she told him that she was a mandated reporter. He explained that he had not told his mother about the abuse. Ms. Moore explained that she was going to have to call the police, and his mother might wonder what was going on. They developed a plan to tell his mother, and she stayed in the room while A.M. told his mother about the abuse. Ms. Moore stated that this was an impactful moment for her. Although A.M. disclosed the information to his mother in Spanish, which Ms. Moore did not speak, she observed their body language. Ms. Moore testified that it appeared consistent with A.M.'s account that he had not previously disclosed this information to his mother. In her report, Ms. Moore documented that A.M. disclosed previous sexual abuse and suicidal ideations to his school counselor. She further documented that A.M. told her he had "intrusive thoughts of being penetrated penis to anus on multiple occasion [sic] by former boyfriend of mom's." Ms. Moore testified that a doctor made a referral for A.M. to the "Care Center", where a forensic interview would be conducted.

Jefferson Parish Sheriff's Office Detective Kristen Hollis testified that she became involved in the instant matter when she received a call to a scene where a juvenile alleged sexual abuse. She testified that it was a delayed report of sexual abuse, which meant it did not occur immediately right before the call. Before speaking with A.M., Detective Hollis scheduled an interview for him at the

"advocacy center."[5] After reviewing the advocacy center interview, she was able to determine a suspect, Defendant. A.M. gave her the name of Defendant, and she located a photo of him on social media. A.M. confirmed that the individual in the photo was the person who violated him. Detective Hollis testified that she identified Defendant's vehicle, and a "hit" was placed on it. Deputies located the vehicle, and Defendant was arrested. Detective Hollis testified that Defendant made a statement with regard to the allegations against him. She did not take the statement herself because Defendant only spoke Spanish. Her supervisor at the time, Sergeant David Canas, spoke Spanish, and he took the statement from Defendant, while Detective Hollis monitored from a different room. After listening and reviewing Defendant's statement and speaking to Sergeant Canas, an arrest warrant was issued for Defendant.

S.G. testified that she was A.M.'s mother. A.M. was the youngest of six children. A.M. lived with S.G., his siblings, and her partner, C.F., at that time. She testified that A.M. considered C.F. to be his stepdad and generally had a good relationship with him, although there was one occasion where they had a verbal altercation. S.G. testified that she met Defendant towards the end of 2010 or the beginning of 2011. They broke up in February 2012 because Defendant was always working or outside the state. S.G. testified that Defendant would sometimes spend the night at her residence on the weekends, and he would spend time with her children when she was not home.

S.G. testified that A.M. never told her about what Defendant did to him. She stated that she became aware of the abuse in September 2020. She was called to come to his school and told to take him to the emergency room at Children's

---

[5] Aubrey Ziegler, forensic interviewer with the Jefferson Children's Advocacy Center, testified that she conducted an interview of A.M. at the Child Advocacy Center ("CAC"). The interview was recorded. A.M.'s relatives were not in the room while the interview took place, which is mandated by law. The interview was monitored by a detective. The CAC interview was published to the jury.

Hospital. A social worker met with her to inform her of what had happened. She and A.M. met with a police officer. A.M. told her that Defendant had abused him. She testified that A.M. has been in counseling, and it has helped him a lot.

M.V. testified that A.M. was her brother, and she was "about four years" older than him.[6] M.V. testified that C.F. was her stepfather, and she and A.M. had a good relationship with him. She testified that she also had a good relationship with A.M. She explained that, at the time that A.M. disclosed the sexual abuse to her, he would get angry over small things. M.V. testified that she first learned about what had happened to A.M. in approximately 2015. She told A.M. not to tell anyone about it because she was scared for her mom and her family. M.V. learned that A.M. may have told a friend about the sexual abuse, but she never told anyone about it. M.V. testified that after the sexual abuse was disclosed to the school counselor, A.M. started to go to counseling, and his anger subsided.

M.V. testified that she recalled Defendant spending nights at their house. She testified she never saw the incidents of sexual abuse occur. However, she testified that she realized she had been at home during one of the incidents of sexual abuse that A.M. told her about. M.V. recalled that, on one of the last days that Defendant came to their home to pick up his items, she was downstairs and A.M. was in their mother's bedroom upstairs. Defendant went upstairs to pack his bag. She recalled it being very quiet. Defendant came back downstairs, collected more items, then went to his car.

A.M. testified that his date of birth was May 6, 2005. A.M. stated he was approximately six or seven years old around the time of the abuse. There were two bedrooms in the apartment where his family lived. He shared one with his siblings, and his mother had her own bedroom. A.M.'s father passed away in Honduras when A.M. was approximately nine years old. A.M. testified that his

---

[6] At the time of trial, M.V. was 21 years old.

mother dated Defendant for a few months during the time they lived in that apartment.[7] Defendant never fully moved into the apartment, but he spent nights there. He recalled Defendant being "cool" and said that he would be nice to him and let him play on his phone. A.M. testified that his mother worked a lot, and when she worked, she would leave him alone with Defendant.

A.M. testified about the first incident of sexual abuse from Defendant. A.M. was usually the first to wake up early, and on that day, he did not have to attend school. His siblings were sleeping. He felt bored and went to his mother's room. The time was approximately 8:00 a.m. or 9:00 a.m. His mother was not home, but Defendant was in bed and A.M. asked him if he could play games on his phone. Defendant let him play with the phone, and A.M. got into the bed with him. A.M. was wearing a t-shirt and basketball shorts. Defendant was wearing boxers. A.M. was lying on his side playing "Talking Tom" and "Jetpack Joyride" on Defendant's phone. Defendant threw a blue blanket over A.M. Defendant was spooning A.M. and holding his lower waist. Defendant pulled A.M.'s shorts down to his mid-thigh area and began to penetrate him. A.M. testified that Defendant penetrated him with his penis in an "in and out" motion. A.M. testified that it felt like he was defecating himself. He testified that Defendant's penis was hard, and Defendant was breathing heavily. A.M. still had the phone in his hands. After a few minutes, Defendant laid A.M. on his back, and he proceeded to perform oral sex on his penis. Defendant's hands were holding A.M.'s waist. Defendant's phone was now by A.M.'s side. Defendant asked him which one he liked more, and A.M. told him he liked the oral better. Defendant then repositioned A.M. back to the previous position they were in, spooned him again, and penetrated him again with his penis. A.M. recalled focusing on the floor, the wall, and the doorway. He testified that when Defendant penetrated him, he felt "icky" and dirty. A.M. again

---

[7] A.M. identified Defendant in open court.

thought he had used the bathroom on himself.  He testified that it did not hurt, but it burned.  After approximately five minutes, A.M. got up, put his clothes on, and went to the bathroom to clean himself.  When he wiped himself, he saw a yellowish/greenish residue.  At the time he thought it was urine or "weird looking" feces.  He was confused about what it was.  He did not tell anyone about the incident.  He testified that he did not know what was happening and did not know it was wrong.  A.M. testified that he did not dislike Defendant after this incident.

A few days to a week later another incident of sexual abuse occurred.  A.M. testified that his sister was downstairs, and his brother was still asleep.  A.M.'s mom was at work.  He knew Defendant would let him play on his phone, so he went to his mom's bedroom to ask him.  He got into bed with Defendant, and Defendant again threw the blanket over him.  A.M. testified that this time the abuse was more quickly paced.  Defendant pulled A.M.'s shorts down and penetrated him.  It lasted approximately five to ten minutes, before A.M.'s sister went upstairs and Defendant stopped.  After the incident, A.M. cleaned himself again because he felt dirty.  He did not tell anyone about the incident because he did not know what was happening.  A.M. testified that he and his mother never spoke about "good touch," "bad touch," or "private parts."  A.M. still thought of Defendant as a "decent guy" and did not know it was wrong.

A.M. testified to a third incident of sexual abuse after his mother and Defendant broke up.  A few weeks to possibly a month after the last incident, Defendant went to their house to pick up items he had in a storage closet upstairs.  His mother was at work, and only A.M. and his sister were home.  While Defendant was upstairs, A.M. went upstairs.  A.M. could not recall if Defendant called him up.  Defendant was kneeling on one leg, getting tools from the closet.  Defendant grabbed A.M. by his hips and turned him around.  He pulled A.M.'s shorts down to his knees and performed oral sex on his anus.  A.M. testified that he

felt Defendant's tongue in his anus going side to side, up and down, and in a penetrating motion. A.M. recalled focusing on the stairs and the wall. He recalled that the stairs were gray and the walls were white. A.M. recalled that Defendant was wearing blue jeans and an orange polo shirt. The incident lasted approximately five to six minutes. Defendant stopped and neither of them said anything to each other. A.M. did not tell anyone about this incident and testified he did not think it was worth telling or that he had to tell someone.

A.M. testified that, when he was approximately 11 years old and in sixth grade, he saw Defendant at a birthday party. He felt anxious and "kind of scared" when he saw Defendant. A.M. testified that at that time he was in a sex education class and was learning about protection, STDs, rape, and what was legal and illegal. While he was taking the class, he thought about what Defendant had done to him, and he felt "extreme discomfort." He testified, "I was like, shocked, because, you know, I couldn't believe that, Oh, wait, I'm one of those people that experienced that kind of – I guess it's abuse." He said soon after, he told his sister about what happened to him. A.M. testified that they were very close, and he knew he could tell her. He did not give her details when he told her and testified he did not feel like "getting too much into that." He said that they had a mutual agreement not to tell anyone. A.M. testified that he did not want anyone else to know at that point because he was embarrassed, ashamed, and it felt like it was his fault. He testified that he felt like he could have not played the games on Defendant's phone, or gotten in the bed, or could have told someone what occurred earlier. He felt he could have stopped it or gotten out of the bed. A.M. testified that because he was a boy, he felt like talking about it would lead to him being made fun of, or that people would call him gay, or say "that [didn't] happen to boys." He felt like even if he came out about it, he would be a "walking joke."

A.M. saw Defendant again when he was approximately 12 or 13 years old.

He accompanied his mom to make a car payment to a friend. A.M. was in the car, and his mom brought Defendant over. She had A.M. say "hi" and shake his hand. A.M. spoke to Defendant and then stayed quiet. S.G. and A.M. left soon after. A.M. felt angry that he saw Defendant again and felt anger towards his mom. He knew she did not know anything, but he still felt angry.

A.M. testified that he was in his freshman year when COVID-19 started. He was taking online classes at home but failing all of them. A.M. was home alone all day, while his mother and sister were at work. He said he did not have anything to do and spent a lot of time thinking about the sexual abuse. He explained that he was not confident in himself, and he hated himself. He expressed that he could not look in the mirror and be proud of what he saw. A.M. testified that he would change his hair, get piercings, and change his appearance, but nothing would change how he felt. He testified that his body did not feel like his own, and he felt like his body was a used rag. He felt anger toward Defendant and toward himself. A.M. explained that he felt lonely and depressed and thought about suicide on a daily basis. He was cutting himself on his upper left arm, his legs, and his torso.[8] A.M. testified that he cut himself because it was quick and relieving. He felt like he was taking control of his own body "with a different kind of pain sensation." A.M. stated that he would joke about what had happened to him with his friends as a way of coping. He testified that some of his friends knew what had happened to him. His friends would not laugh when he joked about it, and they would act uncomfortable.

A.M. testified that he saw a social worker at school, and he disclosed the information to her. He originally saw the social worker as a freshman. He testified that the second time he saw her, there was a lot of discussion about mental health, and he told her about the abuse and how it had been affecting him. He did not

---

[8] A.M. testified that he had scars on his arm from the cutting. He showed the scars on his arm to the jury.

think anything would really come from him disclosing the sexual abuse to her. When he did, however, she called his mother and called Children's Hospital. A.M. felt very anxious and scared. He said he was not prepared to tell his mom. His mother brought him to the hospital. At that point, she did not know what was going on, other than that the school told her that they thought he had severe depression and suicidal thoughts. While at the hospital, he told his mother what happened after he was seen and felt a sense of relief, but he was still scared. A.M. testified that he was worried he or his mother would be in trouble. A.M. began to see a therapist once a week.[9] He testified that his therapist helped him to not blame himself. A.M. testified that he still thought about the abuse but not as much, and it did not affect him as much as it once did.[10]

Anne Troy, a nurse practitioner at Children's Hospital's Audrey Hepburn Care Center, testified that she was a nurse practitioner in forensics.[11] She testified that she did not evaluate A.M. nor had she ever met him. She testified generally as to her experience and expert opinion on particular topics of child abuse. Nurse Troy testified that she had experience evaluating both female and male victims. She explained that there is more shame and embarrassment that accompanies a male victimization and testified that the very nature of the sexual abuse makes males reluctant to disclose the abuse. She testified that factors that could affect the number of times a child is abused are opportunity and access. Nurse Troy explained reasons why child sexual abuse victims do not disclose the abuse right away: naivety, shame, embarrassment, and awareness of their family's situation.

---

[9] A.M. testified that he brought his therapist with him to court. He testified that he had been seeing this therapist for two and a half years. He stated that he had a session with his therapist before testifying in court in order to mentally prepare because he had not talked about the incidents in a while.

[10] When asked by the State why he was at court, A.M. replied:

> To receive justice, to kind of finally fully move this past me and kind of, in a way, shed light on the fact – you know, at first, coming out about this, I was very anxious. I felt like ashamed, I felt embarrassed, but over time I've learned. I guess I am doing something different, I'm kind of making a little change. Not many male victims come out about the abuse they experience as a kid or even as adults, so I guess this kind of puts more light on that subject.

[11] Nurse Troy was accepted as an expert in child abuse and child abuse pediatrics.

Nurse Troy testified that, from her experience, most children do not want to talk about the sexual abuse they have experienced. She explained that where victim's incidents of abuse are similar to one another, such as the actions of the perpetrator, it could affect how the victim remembers those incidents.

Nurse Troy testified that when a child is able to remember sensory details, it assists the examiner in confirming what happened to them. She confirmed that when a child is able to give sensory details, it is noteworthy because it shows something that they have experienced. She further explained that it takes away the "differential of being coached." Nurse Troy confirmed that a child being able to remember a video game that he was playing would be an important sensory detail. She explained that "grounding themselves in the day" would give an examiner a picture of what was going on in the child's experience of abuse. She further confirmed that a child remembering things like a color of a blanket, what he or she was wearing, and remembering that after being anally penetrated he or she felt like they defecated would all be important sensory details.

Nurse Troy testified that one cannot tell the veracity of their recollection of the abuse by a victim's response. She explained that, in a case of delayed reporting, she does not expect to find physical signs of trauma or expect to find DNA. Nurse Troy explained that she very often saw incidents of sexual abuse where a perpetrator abused the child while other people were in the home. She stated that, in cases involving child sexual abuse, she had seen cases where the child did not scream out in pain or cry. She explained that children are silent and shocked. She testified the feeling of pleasure can be confusing for children, and in turn, keep them quiet about abuse. Nurse Troy testified that she had met with children who have experienced abuse but still like the parent, explaining it was "persistence of attachment" due to the child's reliance on the adults in their life to care for them. She testified that victims often blame themselves for the abuse, and

male victims have a more complicated time in disclosing sexual abuse when they were abused by another male.

On February 28, 2023, at the conclusion of the presentation of evidence, a 12-person jury returned a unanimous verdict of guilty as charged. On March 6, 2023, Defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Immediately after sentencing, defense counsel stated, "And Judge, just for the record, notice our intent to file an appeal, Judge, and I will – I will send in a written motion to that effect, also." On April 12, 2023, the defense filed a motion for appeal, which was granted by the trial court on April 17, 2023.[12] The instant appeal followed.

## ASSIGNMENTS OF ERROR

In his counseled assignment of error, Defendant alleges that the evidence was insufficient to support the jury's guilty verdict. In his *pro se* assignments of error, Defendant alleges that the evidence was insufficient to support the verdict, the trial court erroneously allowed the testimony of Anne Troy, and newly discovered evidence requires reversal of his conviction.

## LAW AND ANALYSIS

Sufficiency of Evidence[13]

Defendant argues that the State failed to meet its burden of proof at trial enunciated by the Supreme Court in *Jackson v. Virginia*.[14] Defendant avers that the question left unresolved in the case was if the crime was actually committed. Defendant argues that, because sex crime cases are often solely based on the victim's testimony, it is imperative that police, prosecutors, and all involved corroborate and elicit any pertinent facts so that justice is served and the law

---

[12] Although Defendant's written motion for appeal was not filed until April 17, 2023, we find that his statement immediately after sentencing is interpreted as a timely motion for appeal pursuant to La. C.Cr.P. art. 914(A). *See State v. Murphy*, 07-2032 (La. 2/22/08), 974 So.2d 1290 (*per curiam*).

[13] We will address the counseled and *pro se* sufficiency of the evidence assignments of error jointly.

[14] *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

upheld. Defendant avers that this is especially true in the instant matter when A.M. did not report the abuse until nearly 10 years later. Defendant points to an inconsistency revealed through trial between A.M.'s actual age and the age he told others that the abuse occurred. Defendant also argues that neither A.M.'s sister nor mother saw, heard, or suspected any sexual abuse, and they were in the house during some or all of the three alleged incidents. Defendant alleges there was nothing the defense could do to rebut the claims of A.M., and the State failed to prove every element of the instant case beyond a reasonable doubt; thus, the evidence was insufficient to support the jury's verdict.

The State responds that, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime of aggravated rape of a known juvenile under the age of 13, beyond a reasonable doubt. The State avers that despite Defendant's arguments that the evidence was insufficient, the law states that "[i]n sex offense cases, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even when the State does not introduce medical, scientific, or physical evidence to prove the commission of offense." The State contends that the jury was aware that A.M. waited years to disclose the sexual abuse, and the jury heard testimony from an expert who discussed delayed disclosure in child sexual abuse cases. The State argues the jury found the testimony credible. As to the inconsistencies with regard to A.M.'s age at the time of the abuse, the State avers that the jury could have reasonably concluded that this was attributable to A.M.'s young age at the time of the abuse. The State argues that regardless of whether A.M. was six, seven, or eight when he was abused, he would have been under the age of 13, meeting the age requisite of La. R.S. 14:42(A)(4). The State

argues that the date of the offense is not an essential element of the crime of aggravated rape.[15]

Defendant does not contest on appeal that the State failed to prove any specified essential statutory elements of La. R.S. 14:42(A)(4). Rather, Defendant argues that the State did not prove that the crime was actually committed, while pointing to inconsistencies in the victim's age at the time of the offense and a lack of corroboration.

In sex offense cases, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even when the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 703; *State v. Raye*, 17-136 (La. App. 5 Cir. 10/25/17), 230 So.3d 659, *writ denied*, 17-1966 (La. 6/15/18), 257 So.3d 674. While Defendant questions the credibility of the A.M., the jury was instructed as to credibility and determination of the weight of a witness' testimony. The jury heard A.M.'s testimony, who described in great detail to the jury three separate incidents of sexual abuse. A.M. also recounted the abuse to his sister, his school counselor, the police, and the forensic interviewer. Despite Defendant's argument regarding inconsistencies as to A.M.'s age when the abuse happened, the jury made a credibility determination after considering all of the testimony presented. This Court should not second guess credibility determinations. *See State v. Chinchilla*, 20-60 (La. App. 5 Cir. 12/23/20), 307 So.3d 1189, 1197, *writ denied*, 21-274 (La. 4/27/21), 314 So.3d 838, *cert. denied*, --- U.S. ---, 142 S.Ct. 296, 211 L.Ed.2d 138 (2021).

Defendant questions A.M.'s credibility, specifically as to his age at the time of the incidents. A.M. reported that he was approximately seven or eight years old when the sexual abuse occurred. A.M.'s date of birth was confirmed to be May 6,

---

[15] The State cites to *State v. Lawrence*, 21-733 (La. App. 5 Cir. 11/2/22), 362 So.3d 807, 822.

2005. Testimony from A.M.'s mother revealed that A.M. lived in an apartment from December 2011 to December 2012.[16] A.M.'s mother also testified that she dated Defendant while she lived in the apartment, and A.M. was at least six years old at the time of the abuse.

In *State v. Gaddis,* 07-395 (La. App. 5 Cir. 11/13/07), 973 So.2d 21, 28, *writ denied sub nom. State ex rel. Gaddis v. State*, 08-156 (La. 10/10/08), 993 So.2d 1277, this Court stated that although there were some inconsistencies between the victim's statements during his CAC interview and his testimony at trial, the jury's decision to believe the victim's account of events over the defendant's testimony was rational. This Court cited to its previous decision in *State v. Simmons*, 03-20 (La. App. 5 Cir. 4/29/03), 845 So.2d 1249, 1258, where it stated the discrepancies in the child victim's statement were not necessarily indicative of untruthfulness or incompetence. This Court in *Simmons* stated that the memory lapse and alleged inconsistences may have resulted from "the child's tender age—5—years—old on the date of the incident." *Id.*

After review, we find that the jury found A.M.'s testimony credible, despite the purported inconsistency of his age at the time of the abuse. We conclude that any discrepancy in A.M.'s recollection of his age at the time of the sexual abuse could be attributed to the delayed disclosure in reporting the abuse. We also find that whether A.M. was six, seven, or eight years old at the time of the sexual abuse, inconsistencies in A.M.'s recollection of his age at the time of the abuse could have resulted from his young age.[17] As the State pointed out in its brief, La. R.S.

---

[16] S.G's lease for 1157 Orange Blossom Lane confirms the lease date range from December 2011 to December 2012.

[17] Nurse Troy testified that where victim's incidents of abuse are similar to one another, such as the actions of the perpetrator, it could affect how the victim remembers those incidents. The circumstances surrounding the first and second incidents of the sexual abuse of A.M. were very similar.

This Court has held that even when some slight inconsistencies in a victim's testimony, interviews, and statements are present, a jury's decision to believe the victim over the defendant is rational when the victim consistently described the details of the incident throughout her statements, interviews, and testimony. *State v. Miller*, 11-498 (La. App. 5 Cir. 12/13/11), 84 So.3d 611, 619, *writ denied sub nom. State ex rel. Miller v. State*, 12-176 (La. 9/14/12), 97 So.3d 1012. In the instant matter, details of the sexual abuse from A.M.'s testimony are consistent with the CAC interview and A.M.'s account of the events to the counselor at his school.

14:42(A)(4) only requires that the victim be under the age of 13. We find that, despite Defendant's argument that the inconsistency in A.M.'s age should bear on the sufficiency of the evidence, the jury made a credibility determination when it found Defendant guilty of aggravated rape.

Defendant alleges that the third incident that A.M. described involved Defendant licking his anus and because there was no penile or digital penetration, this incident did not meet the elements for first degree rape. We find that this is an inaccurate statement of the law. As discussed, La. R.S. 14:42(A) provides that aggravated rape is a rape committed upon a person 65 years of age or older, or where the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under one of the listed subsections. La. R.S. 14:41(A)(C) provides that "oral sexual intercourse" includes the intentional engaging in "[t]he touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender." A.M. testified in detail that he felt Defendant's tongue in his anus moving in a penetrating motion. As such, we find that the facts of this third incident meet the requisites of La. R.S. 14:41(A)(C), and Defendant's argument in this regard is without merit.

In further support of his argument, Defendant points out that A.M.'s mother and sister did not see, hear, or suspect any sexual abuse, although they were in the house for some or all of the three incidents. Defendant's contention is inaccurate. While A.M. testified that his sister was home during all three incidents, he also testified that his mother was at work when all three incidents occurred. This was corroborated by A.M.'s mother's own testimony, when she stated Defendant would sometimes spend nights at her house on the weekends, and he would spend time with her children when she was not home. Nurse Troy explained that it was not uncommon for sexual abuse to occur while other people were in the home, and that she had seen cases where the child did not scream out in pain or cry because the

child was in shock. Defendant also points to the "impossible" hurdle to defend a sex offense case with lack of physical evidence or witnesses. However, as earlier discussed, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, and in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *See Clifton*, *supra*. We find that the jury weighed the evidence and made a credibility determination in relying on the victim's testimony.

Defendant also mentions several times in his brief that the abuse was not reported until nearly 10 years later and that corroboration is needed in such a case. As discussed, in *Clifton*, *supra*, this Court stated that in sex offense cases, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even when the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. Furthermore, an explanation of why delayed reporting occurs was provided in the instant matter. Nurse Troy explained that, from her experience, most children do not want to talk about the sexual abuse they have experienced. She testified that more shame and embarrassment accompanied male victims and that the very nature of the sexual abuse made males reluctant in reporting it. She also testified that male victims have a more complicated time disclosing issues of abuse when they were abused by another male. Again, we find that the jury made a credibility determination.

Defendant does not contest on appeal that the State failed to prove any specified essential statutory elements of La. R.S. 14:42(A)(4). As such, we need not address the evidence as it relates to each essential element. *See State v. Nelson*, 14-252 (La. App. 5 Cir. 3/11/15), 169 So.3d 493, 500 n.12, *writ denied*, 15-685 (La. 2/26/16), 187 So.3d 468; *State v. Henry*, 13-558 (La. App. 5 Cir. 3/26/14), 138 So.3d 700, 715, *writ denied sub nom. State ex rel. Henry v. State*, 14-962 (La.

2/27/15), 159 So.3d 1064.  Nevertheless, the State presented sufficient evidence under the *Jackson* standard to establish the essential statutory elements of aggravated rape.  A.M. testified in detail to three incidents of rape.  During the first incident, A.M. testified that Defendant anally penetrated him twice with his penis, and that Defendant performed oral sex on A.M.'s penis.   During the second incident, Defendant anally penetrated A.M. with his penis again.  During the third incident, Defendant performed oral sex on A.M.'s anus.  While testifying to all three incidents, A.M. recalled specific details like what he and Defendant were wearing and the color of the blanket during the first occasion.  A.M. recalled that he was focusing on things like the carpet, the wall, and the stairs.  A.M. was able to recall the color of the stairs and the wall.  Testimony at trial established that A.M.'s date of birth was May 6, 2005.  It is clear that A.M. was under the age of 13 at the time of all of the incidents of sexual abuse.  Accordingly, we conclude that, after viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that the evidence was sufficient under the standard set forth in *Jackson* to support Defendant's conviction.[18]

Testimony of Anne Troy

Defendant argues that Nurse Troy was a "prosecution hack" and never met with A.M.  Defendant references La. C.E. arts. 702 and 705(B) without making specific arguments.  Instead, Defendant again raises his allegations that the case lacked corroboration and questions the victim's credibility.  Defendant also argues

---

[18] *See* this Court's decision in *State v. Banks*, 17-358 (La. App. 5 Cir. 3/14/18), 241 So.3d 1240, 1249, *writ denied,* 18-586 (La. 3/25/19), 267 So.3d 599, *cert. denied*, --- U.S. ---, 140 S. Ct. 268, 205 L.Ed.2d 140 (2019) (where this Court found sufficient evidence supported a conviction for aggravated rape of a child under the age of 13.  The victim, the defendant's daughter, testified that the defendant forced her to engage in vaginal intercourse with him on her tenth birthday.  Despite the three-year delayed disclosure, to which an expert testified was normal in child sex cases, this Court found that the victim was consistent as to the details of the rape.  This Court stated that it would not reweigh the credibility of a witness.).

that Nurse Troy should not have been allowed to testify because she never met with, examined, or interviewed A.M.

On July 29, 2022, the State filed State's Notice Pursuant to Article 719, informing the defense that it intended to call Nurse Troy as an expert. The notice included her *curriculum vitae* and stated that Nurse Troy would testify to her knowledge regarding "general child sexual abuse, specifically addressing issues of delayed disclosure and the affect sexual abuse may have on children concerning delayed and partial disclosure." After Nurse Troy testified as to her qualifications at trial, the State offered her as an expert in child abuse and child abuse pediatrics. Defense counsel had no questions for Nurse Troy with regard to her qualifications. The trial court accepted Nurse Troy as an expert in the aforementioned fields. The record does not indicate that defense counsel objected to Nurse Troy's acceptance as an expert.

"An irregularity or error cannot be availed of after a verdict unless it was objected to at the time of occurrence." La. C.Cr.P. art. 841(A). In order to seek appellate review of an alleged trial court error, a party must make a contemporaneous objection, and he must state the grounds for that objection. As such, we find that this error was not properly preserved for review. *See State v. Williams*, 20-46 (La. App. 5 Cir. 12/30/20), 308 So.3d 791, 838, *writ denied*, 21-316 (La. 5/25/21), 316 So.3d 2 (where this Court found that the defendant failed to preserve for appellate review a police chief's classification as an expert when he made no objection to the classification at trial); *State v. Gonzalez*, 15-26 (La. App. 5 Cir. 8/25/15), 173 So.3d 1227, 1235-36 (where this Court found that the defendant waived his appellate challenge to the admission of expert testimony where the defendant's counsel expressly stipulated to the qualifications of the State's witness to testify as an expert on the matter, and the defendant otherwise failed to object to the testimony regarding delayed disclosure).

Newly Discovered Evidence

Defendant argues that the verdict was in error because the jurors were not aware of A.M.'s receipt of the "U" Nonimmigrant status certification nor A.M.'s mother's immigration status/benefit. Defendant avers that Nurse Troy could have testified as to this in regards to her testimony on "secondary gains." The record indicates that A.M. did not receive the certification from the State until he requested it following the trial. With regard to A.M.'s mother's immigration status, the trial court specifically ruled that it would not allow the State or defense to question her about it because it was not relevant. Defense counsel did not object to this ruling. *See State v. Lyons*, 01-719 (La. App. 5 Cir. 11/14/01), 802 So.2d 801, 806 (where this Court found that the defendant failed to preserve for appellate review witness testimony that he alleged to be irrelevant. This Court found that the defendant failed to lodge a contemporaneous objection to the portion of the witness' testimony that he was now challenging on appeal.). Accordingly, we find that Defendant's assignment of error lacks merit.

Errors Patent Review

The record was reviewed for errors patent according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990). The following errors were found.

The record reflects that the trial court failed to inform Defendant of the sex offender registration requirements in accordance with La. R.S. 15:540, *et seq*. Defendant's conviction of aggravated rape, in violation of La. R.S. 14:42, is defined as a sex offense under La. R.S.15:541(24). La. R.S. 15:542 outlines the mandatory registration requirements for sex offenders. La. R.S. 15:543(A) requires the trial court to notify a defendant charged with a sex offense in writing of the registration requirements of La. R.S. 15:542.

This Court has recognized that the trial court's failure to provide the

notification constitutes an error patent and warrants a remand for written notification, even where a life sentence has been imposed. *See State v. Doucet*, 17-200 (La. App. 5 Cir. 12/27/17), 237 So.3d 598, 609-10, *writs denied*, 18-77 (La. 10/8/18), 253 So.3d 789, and 18-196 (La. 11/5/18), 255 So.3d 1052, *cert. denied*, -- U.S. ---, 139 S.Ct. 2676, 204 L.Ed.2d 1079 (2019). Accordingly, we remand this case to the trial court with instructions to the trial judge to inform Defendant of the registration requirements for sex offenders by sending appropriate written notice to Defendant and to file written proof in the record that Defendant received such notice. *See also State v. Baskin*, 15-704 (La. App. 5 Cir. 3/30/16), 188 So.3d 470, 475, *writ denied*, 16-833 (La. 4/24/17), 220 So.3d 741 (where this Court stated that the record indicated that the trial judge did not provide written notification of the registration requirements. This Court remanded the matter and ordered the trial court to inform the defendant of the registration requirements of La. R.S. 15:542 by sending appropriate written notice to him within ten days of the rendition of its opinion and to file written proof in the record that the defendant received such notice.)

Additionally, the uniform commitment order ("UCO") fails to include as a "Sentence Condition" pre-printed on the form that Defendant shall comply with the Sex Offender Registration. The UCO specifically contains an unchecked box next to a statement that Defendant shall comply with these requirements. We instruct the trial court to correct the UCO to reflect that Defendant shall comply with the sex offender registration statute. We further direct the Clerk of Court for the 24th Judicial District Court to transmit the corrected UCO to the appropriate authorities, in accordance with La. C.Cr.P. art. 892(B)(2) and the Department of Corrections' legal department. *See Chinchilla*, *supra* and *State v. Carriere*, 19-366 (La. App. 5 Cir. 12/26/19), 289 So.3d 149, 153 (wherein this Court remanded the matters for the trial court to correct the UCOs to reflect that the defendant shall comply with

the sex offender registration requirements).

## DECREE

For the foregoing reasons, we affirm Defendant's conviction for first degree rape of a juvenile under the age of 13 and life sentence.  We remand the matter with instructions expressed in this opinion.

**<u>AFFIRMED;</u>**
**<u>REMANDED WITH INSTRUCTIONS</u>**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **MAY 8, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 23-KA-375

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE FRANK A. BRINDISI (DISTRICT JUDGE)
ANDREA F. LONG (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          JANE L. BEEBE (APPELLANT)

**MAILED**
EDGAR M. HIDALGO #776894 (APPELLANT)          ERIC CUSIMANO (APPELLEE)
ELAYN HUNT CORRECTIONAL CENTER          HONORABLE PAUL D. CONNICK, JR.
POST OFFICE BOX 174          (APPELLEE)
ST. GABRIEL, LA 70776          DISTRICT ATTORNEY
          TWENTY-FOURTH JUDICIAL DISTRICT
          200 DERBIGNY STREET
          GRETNA, LA 70053